HERBERT GUTH, ET AL.

V.

HAMLET ASSOCIATES, INC., ET AL.

Record No. 821140

September 6, 1985

Present: All the Justices

*Larry W. Thomas (Cameron, Hornbostel, Adelman & Butterman,* on briefs), for appellants.

*Thomas Dugan (Hall, Surovell, Jackson & Colten, P.C.,* on brief), for appellees.

COMPTON, J., delivered the opinion of the Court.

This is a controversy arising from a series of financial transactions between two individuals. Principally, we deal with questions involving the Uniform Commercial Code and the statute of limitations.

On July 17, 1980, appellants Herbert J. Guth (hereinafter, Guth) and Joanne Guth, his daughter, filed this suit against appellees Hamlet Associates, Inc., and Robert Greenberg for approximately $40,000.00. In a six-count amended motion for judgment, the plaintiffs sought recovery of the foregoing amount as compensatory damages and added a claim for $25,000.00 punitive damages, arising from dealings between Guth and Greenberg beginning in 1973.

Subsequently, defendants filed a pre-trial motion for summary judgment and the trial court sustained the motion in November 1981 pertaining to one count only of the complaint. In a March 1982 jury trial, the court sustained defendants' motion to strike the plaintiffs' evidence at the conclusion of the plaintiffs' case-in-chief. In the April 1982 order appealed from, the court entered judgment in favor of the defendants "as to all counts." At the trial, the only testimonial evidence came from Guth.

During the early 1970s, Guth, a resident of Maryland, and Greenberg, a resident of Northern Virginia, were acquainted and were employed full-time by the same federal agency. According to Guth, "Greenberg was known around the agencies as one involved in various financial matters. . . ." Prior to the transactions in question, Guth had been "involved" in a mortgage investment club of which Greenberg was the treasurer.

In 1970, Greenberg "formed" Hamlet Associates, Inc. The corporate business address was Greenberg's home address. Greenberg and his wife were the sole stockholders. He was president of Hamlet. She was vice-president and secretary of the corporation.

Hamlet was formed mainly for the purpose of using corporate assets to invest in other activities, such as the purchase of health club contracts. Greenberg, acting for the corporation, would buy

at a discount installment contracts between health clubs and their patrons. The health club customers would then make payments directly to Hamlet. Hamlet's profit, if any, would be the difference between the price it paid for the contract and the amount paid by the health club patron.

Initially, the corporation operated on funds loaned to it by Greenberg individually. Thereafter, Greenberg obtained corporate funds from other sources, including Guth.

On November 14, 1973, Guth "loaned" $5,000.00 to Hamlet. This was the first in the series of transactions giving rise to this controversy. In return, Greenberg executed and delivered to Guth the following typewritten document which Greenberg had prepared on corporate stationery:

"HAMLET ASSOCIATES INC.
P.O. Box 1268
Springfield, Virginia 22151

November 14, 1973

## CORPORATE NOTE

Hamlet Associates, Inc., a Virginia corporation located at 7506 Hamlet St., Springfield, Va., 22151, acknowleges [sic] receipt of five thousand dollars ($5000.00) as a loan from Joanne Guth. These funds will be used by the corporation to purchase discounted sales contracts and for other corporate business.

Hamlet Associates, Inc. agrees to pay interest on this loan at the rate of one percent (1%) per month on the unpaid balance. As interest is earned, it will be added to the unpaid balance and earn interest at the at the [sic] above rate. Hamlet Associates, Inc. will provide the lender with reports of the status of this account every six months.

Either the lender or the corporation may elect to have interest paid on a monthly basis in lieu of being added to the unpaid balance upon written notification to the other party.

The lender may request repayment of the unpaid balance by providing written notification requesting the borrower to arrange for payment after a ninety (90) day period. The borrower may at its option, either pay off the loan in full or repay the loan in twelve (12) monthly installments.

The borrower may arrange for repayment of the loan by providing written notification with a ninety (90) day waiting period. Repayment may be either in full or on an installment basis.

This document supercedes the handwritten note of the same date.

HAMLET ASSOCIATES, INC

By  /s/Robert Greenberg
Robert Greenberg, President

Loan Repayment                    /s/Robert Greenberg
Guaranteed:                       Robert Greenberg"

Guth explained that the note was made payable to Joanne Guth, his daughter, because previously he had made other loans to Greenberg, which had been repaid, using names of family members for those "investments." Greenberg had no discussions with the daughter. Guth testified that the provisions in the fourth and fifth paragraphs regarding repayment were included because the loan proceeds were being used to purchase health club installment contracts and "it would be difficult for Mr. Greenberg to pay off this money immediately so there was a provision to pay it off over a period of time."

On January 9, 1974, Guth paid another $5,000.00 to Greenberg (the Second Transaction). Another document was prepared and executed by Greenberg, and delivered to Guth memorializing that transaction. This document was identical to the writing in the First Transaction, except it named Herbert Guth as the lender, it bore the January 1974 date, and it did not contain the final sentence referring to a handwritten note. Again, Greenberg executed the instrument on behalf of the corporation and individually as guarantor.

On May 23, 1974, Guth "made another loan of $4,000.00" (the Third Transaction). Greenberg supplied Guth with a different writing in connection with this transaction. On a carbon copy of the note used in the Second Transaction, Greenberg placed the following handwritten statement under the foregoing date:

"Receipt of $4,000.00 acknowledged in accordance with above. This is a temporary receipt to be replaced by two notes

Robert Greenberg"

Guth testified that the terms of the Third Transaction were "precisely the same" as the terms for the first two loans. Guth never received any notes to replace the handwritten receipt although he asked for them "repeatedly."

On March 13, 1975, Guth loaned the corporation $5,000.00 (the Fourth Transaction). Greenberg did not personally guarantee this obligation and no written document was prepared setting forth the terms of that transaction.

During the period 1974-80, Guth had "sporadic, but continuing" conversations with Greenberg about "how matters were proceeding with the health clubs." During the early part of that period, Greenberg indicated that "it was going fine," and "they were doing well." Guth received written status reports from Greenberg as required by the notes. These reports were prepared on corporate stationery and were received through 1976. Generally, the reports showed monthly interest earned and the balance of principal and interest due the lender. Guth received no status reports after December 31, 1976.

In addition, Guth received copies of Internal Revenue Service forms 1099, "Statement for Recipients of Interest Income," for the years 1974, 1975, and 1976. These forms were prepared in the name of Hamlet for the accounts of both Guth and his daughter. Also, Guth testified that two payments were received "by check" in the amount of $500.00 each on the daughter's account in April and May, 1977.

During 1977, when Guth failed to receive a status report, he called Greenberg by telephone to inquire about "how the thing was going. . . ." According to Guth, Greenberg said "things were going not too badly." Later in 1977, Guth "started asking more questions" of Greenberg and learned that one of the health clubs with which Greenberg was dealing had closed. However, Guth "got the impression" that the customers had been assigned to another exercise facility and would continue to pay on their contracts. Thus, he thought there was not "any great cause for

[alarm]." But at one point in 1977 Greenberg advised Guth that he "had written off his own loans" to the corporation and he encouraged Guth to do likewise on his 1977 income tax returns. Guth testified he did not follow the advice in 1977 but that he did "write off" the loans later, probably on his 1980 tax return.

In August 1978, Guth "was requesting" Greenberg to repay the loans. Greenberg told Guth that "his lawyer [was] looking into the problem, . . . ." and "that he would discuss specifically on how he would repay the loan in a few months." In January of 1979, according to Guth, Greenberg told him that his lawyer was "pursuing recovery from the health spas." At that time, Guth said, he "was given to understand" that Greenberg "would make a settlement with me to pay off these loans."

In a letter addressed to Greenberg dated March 31, 1980, an attorney for Guth and his daughter demanded repayment of the outstanding balances of the four loans consisting of principal and accrued interest. After this suit was filed in July of 1980, counsel for the plaintiffs made another demand for repayment in a letter dated August 20, 1980 addressed jointly to Hamlet and Greenberg.

The plaintiffs' amended motion for judgment sought recovery on several theories against the defendants jointly and severally. The first three counts were based on the writings of the First, Second, and Third Transactions. The fourth count sought recovery of the amount allegedly due under the Fourth Transaction on the basis of a loan "which defendants promised to repay." The fifth count sought recovery of the amounts represented by all four transactions on the basis of an oral promise by both defendants to repay the loans. Finally, the sixth count sought recovery of the total amount of the loans on the theory of fraudulent inducement.

In finding against the plaintiffs, the trial court ruled that the statute of limitations had expired "with respect to all of the promissory notes and other obligations upon which suit was brought. . . ." The court further decided that the defendants had not acknowledged the debts within the meaning of the applicable statute. Also, the court ruled there was insufficient evidence of fraud or other conduct of the defendants which would estop them from relying on the statute of limitations or that would toll the statute of limitations.

On appeal, as in the trial court, the parties agree that the five-year and three-year statutes of limitations set forth in Code §

8.01-246(2) and (4) are applicable to this controversy. *See* Code § 8.01-1. The foregoing subsections provide, in part, that actions founded upon a written contract shall be brought within five years "next after the cause of action shall have accrued," and that actions upon any unwritten contract shall be brought within three years after accrual of the cause of action. Initially, the crucial question is when did the applicable limitations begin to run or, more precisely, when did the causes of action accrue.

Preliminarily, we must decide whether Title 8.3 of the Uniform Commercial Code (UCC) applies to the written documents furnished by defendants to Guth in the first three transactions. Viewing the evidence in the light most favorable to plaintiffs, we will treat the memorandum in the Third Transaction as incorporating the terms of the first two notes, as Guth testified.

■ During oral argument on appeal, counsel for the plaintiffs stated he would "assume" that the three promissory notes were negotiable instruments. This position is contrary to the argument made in his opening appellate brief but consistent with the position taken on behalf of the plaintiffs in the trial court. In order to adjudicate the appeal within the context of the arguments made at the trial level, we will likewise assume the notes in the first three transactions were negotiable instruments and that the UCC applies.

■ According to the UCC, one of the characteristics of a negotiable instrument is that the writing must "be payable on demand or at a definite time. . . ." § 8.3-104(1)(c). "Instruments payable on demand include those payable at sight or on presentation and those in which no time for payment is stated." § 8.3-108. Because no time for payment was stated in the notes in issue, they are demand notes under the UCC, and not time instruments.

UCC § 8.3-122 is at the center of the legal dispute here. As pertinent to this controversy, the statute provides that: "(1) A cause of action against a maker . . . accrues . . . (b) in the case of a demand instrument upon its date or, if no date is stated, on the date of issue." The trial court ruled, and the defendants contend on appeal, that under the plain terms of § 8.3-122(1)(b), the causes of action against the corporate defendants on the notes in the first three transactions accrued on their dates, November 14, 1973, January 9, 1974, and May 23, 1974, respectively, and that the five-year statute of limitations had run on each claim when this suit was filed on July 17, 1980.

The plaintiffs argue, however, that the statute of limitations did not begin to run against the corporation until the 1980 formal demand. The plaintiffs recognize that ordinarily the cause of action against a maker on a demand note accrues on its date of issue. Nonetheless, they argue, "if the demand note and the parties thereto contemplated an actual demand, the cause of action accrues at the time of the demand, not on the date of the note." The plaintiffs contend that the evidence in this case, both the notes and Guth's testimony, show that it was the intention of the parties that the obligations would not become due immediately. They say that the provisions of the fourth and fifth paragraphs of the notes permitting installment payments, together with Guth's testimony about the purpose for such provisions, demonstrate such intention. We disagree with the plaintiffs' contentions.

The plaintiffs' argument blurs the distinction between "maturity" of an instrument and the "demand" for payment of the obligation, as those terms affect the accrual of the cause of action. A demand note matures and is payable at once, and interest and the statute of limitations commence to run on that date. *Bacon* v. *Bacon,* 94 Va. 686, 687, 27 S.E. 576, 577 (1897). Of course, every demand note contemplates that payment will be triggered by an actual demand in the form of a presentation or the equivalent. Nevertheless, the need for an actual demand does not affect the maturity of the obligation or the running of the period of limitations.

In *Shackleford* v. *Olsen,* 675 S.W.2d 171 (Tenn. 1984), the instruments were "payable thirty (30) days after receipt of written demand for payment thereof." The court held that "the right to make a demand was unconditional and was complete upon execution of the instruments." *Id.* at 174. Holding that the statute of limitations began to run on the notes from the date of their execution, the court said:

> "Although there is some contrary authority, there are numerous cases holding that a provision for payment thirty days after demand does not alter the character of an instrument from a demand note to a time instrument. It is frequently held that the provision for payment within a specified time after demand is inserted in order to give the debtor a reasonable time to make arrangements to pay a debt which has already become due because of its demand nature." *Id.*

In *Shields v. Prendergast,* 36 N.C. App. 633, 244 S.E.2d 475 (1978), the note was "[d]ue at request with 30 days notice." The court held that the instrument was a demand note and that the period of limitations began to run from its date. In deciding that the provision for thirty days notice did not postpone the date upon which the period of limitations would begin to run, the court, quoting an earlier North Carolina case, stated:

> " 'The debt which constitutes the cause of action arises immediately on the loan. It is quite clear that a promissory note, payable on demand, is a *present debt* and is payable without any demand, and the statute begins to run from the date of it.' " *Id.* at 634, 244 S.E.2d at 476.

In *Environics, Inc. v. Pratt,* 50 A.D.2d 552, 376 N.Y.S.2d 510 (1975), the note was payable "thirty days after demand." The New York court held that the language of the note did not take the contract out of the general rule that no demand is necessary to accrue the cause of action. In holding the action time-barred, the court said that the words "on demand" did not limit the obligation to pay presently, but were used to show the debt was due. The court stated that, under the language

> " 'thirty days after demand', the holder was free to make demand immediately. The notice was for the benefit of the debtor. The debtor could at any time waive the notice and tender the debt. The debt was due but the creditor agreed to limit his right to sue presently." *Id.* at 553, 376 N.Y.S. 2d at 511.

*See* Annot., 71 A.L.R.2d 284. *But see Bank of Nova Scotia v. St. Croix Drive-In Theatre,* 552 F.Supp. 1244 (D.C. V. I. 1982), *aff'd.* 728 F.2d 177 (3rd Cir. 1984); *Shapleigh Hardware Co. v. Spiro,* 141 Miss. 38, 106 So. 209 (1925); *Eggers v. Eggers,* 79 S.D. 233, 110 N.W.2d 339 (1961).

■ In the present case, there was no deferral of the maturity of the obligations beyond the dates of the instruments. There was merely a deferral of the payments on the fixed obligations with such payments to be made over a specified period of time after the "written notification" provided for in the fourth and fifth paragraphs of the instruments. This interpretation comports fully not only with the provisions of the notes but also with the evidence

in the case. Guth testified the notes provided for deferred payments because Greenberg was buying contracts which themselves permitted installment payments. According to Guth, if either the lender or the borrower desired repayment, Greenberg would need time to accumulate the funds because of the nature of the commodity with which he was dealing. The effect of the plaintiffs' argument is to make the maturity of these demand notes conditional on a later event to occur on some unknown date in the future. Neither settled law nor § 8.3-122 provides for such an exception under these circumstances.

Thus, we hold that the trial court correctly decided that the period of limitations had expired as to the corporate maker on the notes given in the first three transactions. In addition, the court below properly held that the three-year statute of limitations had run on the oral agreement between the corporation and Guth in the Fourth Transaction.

The plaintiffs contend that, even if the trial court was correct in deciding the statute of limitations had run against the corporate maker of the instruments, the court erred in holding the action against Greenberg, the guarantor, was time-barred. The plaintiffs urge us to hold that Greenberg was both an indorser and a guarantor in the First, Second, and Third Transactions. They say that, even if the causes of actions against the maker accrued on the dates of the instruments under subsection (1)(b) of § 8.3-122, the statute of limitations did not begin to run against Greenberg until after there was a demand following dishonor by the maker, according to subsection (3) of the statute. It provides, in part: "A cause of action against a drawer of a draft or an indorser of any instrument accrues upon demand following dishonor of the instrument."

■ We reject this contention. The cause of action on Greenberg's guaranty accrued at the same time the statute of limitations began to run on the underlying obligation. Subsection (3) of § 8.3-122 does not apply to a "guarantor," only to an "indorser." The undertaking of a guarantor is different from an ordinary indorser and generates different liabilities. Code § 8.3-416 of the UCC describes the contract of a guarantor. In part, that statute provides:

"(1) 'Payment guaranteed' or equivalent words added to a signature mean that the signer engages that if the instrument

is not paid when due he will pay it according to its tenor without resort by the holder to any other party."

Here, by use of the language "loan repayment guaranteed," Greenberg agreed to pay the obligation when due without resort by Guth to the maker. In contrast, the liability of an ordinary indorser is expressly dependent upon dishonor, unless the endorsement otherwise specifies. Code § 8.3-414(1). Thus, Greenberg's higher obligation is virtually indistinguishable from the obligation of the corporate maker. Accordingly, this primary liability of one who guarantees payment makes the cause of action against the guarantor, like that of the maker, accrue on the date of the promissory demand note. *Ligran, Inc.* v. *Medlawtel, Inc.,* 86 N.J. 583, 432 A.2d 502 (1981); *Bank of New York* v. *Bersani,* 90 A.D.2d 302, 457 N.Y.S.2d 142 (1982). We conclude that the trial court did not err in deciding the action against Greenberg was time-barred.

■ Alternatively, the plaintiffs argue that the suit is timely because the period of limitations was revived as the result of acknowledgments of the debts by the defendants, within the meaning of Code § 8.01-229(G). That statute provides, as pertinent here, that:

"1. If any person against whom a right of action has accrued on any contract, . . . promises, by writing signed by him or his agent, payment of money on such contract, the person to whom the right has accrued may maintain an action for the money so promised, within such number of years after such promise as it might be maintained if such promise were the original cause of action. An acknowledgment in writing, from which a promise of payment may be implied, shall be deemed to be such promise within the meaning of this subsection."

The plaintiffs argue that rendition of the status reports through 1976, furnishing copies of the tax information forms through 1976, and the two partial payments made in April and May, 1977, on the First Transaction, operated to permit the periods of limitations to run from those dates, thus making the 1980 suit timely.

The items relied upon by the plaintiffs all were in writing, prepared in the name of the corporate defendant, but contained no

express promise to pay. The question then becomes whether the plaintiffs presented sufficient evidence, to withstand a motion to strike, of an acknowledgment in writing from which a promise of payment may be implied. The defendants do not claim the corporate "signature" was insufficient under the statute. Rather, defendants contend that the status reports and tax forms were insufficient acknowledgments because they were "documents required to be prepared [by the terms of the notes and the tax laws], and not gratuitiously prepared." They say the documents fail to demonstrate reaffirmation of intent to pay the debts because the documents *had* to be prepared under the contracts and the law. We reject this theory. Section 8.01-229(G) does not distinguish between "necessary" and "gratuitous" writings.

We hold that the plaintiffs presented evidence of acknowledgment sufficient to raise an issue for the jury. Even though the documentary and testimonial evidence is not conclusive, a review of both indicates to us that, prima facie, the status reports, but not the tax forms, constitute evidence of acknowledgment under the statute. We view the reports as evidence of direct and unqualified admissions of present, subsisting debts from which promises to pay would naturally and irresistibly be implied. *Bell* v. *Crawford,* 49 Va. (8 Gratt.) 110, 120 (1851).

With respect to the First Transaction, seven reports were received by Guth bearing dates from April 1, 1974 to December 31, 1976 inclusive. While there are handwritten notations made on some of the forms, which are not explained by the record, the figures appear to relate to the loan of $5,000 dated November 14, 1973 in the name of Joanne Guth, and constitute evidence from which a promise to pay the obligation may be implied and upon which to establish a new period of limitation. *See Tyler Gilman Corp.* v. *Williams,* 216 Va. 548, 221 S.E.2d 129 (1976).

With respect to the Second and Third Transactions, there are seven other reports dated January 1, 1974 to December 31, 1976 inclusive. Guth testified that these reports related to the 1974 loans. Again, there are unexplained handwritten notations on the typed reports. Nevertheless, the writings appear to be a specific acknowledgment of the debts. *See Bickers* v. *Pinnell,* 199 Va. 444, 100 S.E.2d 20 (1957). *Cf. Magarity* v. *Shipman,* 93 Va. 64, 24 S.E. 466 (1896) (statement of accounts showing balance due held insufficient acknowledgment of separate items of liability from which the balance results).

The tax forms have no probative value. They do not identify any particular debt. Moreover, the figures shown on the tax forms are mostly inconsistent with the amounts of interest shown on the status reports, rendering identification with any specific debt virtually impossible. For example, the interest reported on Joanne Guth's 1974 tax form was $167.35. The status reports for the First Transaction show Joanne Guth apparently earned $482.79 interest during that year on the $5,000.00 loan made in 1973.

■ The defendants contend, however, that even if there is sufficient acknowledgment to revive the period of limitations against the corporate defendant, such revival based on corporate writings cannot be attributed to Greenberg, the guarantor. We reject this contention. As we have previously stated, agreeing with defendants' contention on another issue in this appeal, the guarantor's liability is virtually indistinguishable from the maker's liability under these circumstances. Subsection (G)(2) of Code § 8.01-229 provides, in part: "The plaintiff may sue on the new promise described in paragraph 1 of this subsection or on the original cause of action. . . ." The suit was based on the original causes of action and Greenberg's initial liability follows the acts of the corporation that revived the corporation's liability on the first, second, and third notes. These corporate acts were performed well before the dates that Greenberg contends the statute of limitations expired. Under the circumstances of this case, the maker has not been discharged from liability and the guarantor remains bound by his contract.

Next, we will address the issue of part payment by Greenberg. The case will be remanded and this issue may arise on a new trial if the plaintiffs do not ultimately prevail on the foregoing aspect of the acknowledgment question.

The evidence of part payment consists of Guth's testimony that, "Two payments were made," and that they were received in April and May, 1977, "By check, I believe." In addition, the status report for the First Transaction dated December 31, 1976 contains a handwritten notation, "check received" in the amount of $500.00 each on "4/13/77" and "5/10/77." While the record does not identify the author, presumably Guth made the notations.

■ We consistently have held that, standing alone, part payment of the principal or payment of interest does not toll or remove the bar of the statute of limitations. *Tyler Gilman Corp.,*

216 Va. at 550, 221 S.E.2d at 131; *Layman v. Layman,* 171 Va. 317, 321-22, 198 S.E. 923, 925 (1938); *Gwinn v. Farrier,* 159 Va. 183, 191, 165 S.E. 647, 650 (1932); *Quackenbush v. Isley,* 154 Va. 407, 413, 153 S.E. 818, 820 (1930); Burks Pleading and Practice 421 (4th ed. 1952). When payment by check is involved, the rule is based on the requirement that a writing, to be an acknowledgment under the statute, must be an unqualified admission of a subsisting debt which the party is liable for and willing to pay. *See Quackenbush,* 154 Va. at 413, 153 S.E. at 821. Here, while there is evidence of two checks, no evidence exists to show there was any explanatory writing upon either of them, except a mere order upon a bank signed by the maker to pay the payee the amount stated. *See Gwinn,* 159 Va. at 191, 165 S.E. at 650. The record fails to establish that any notation appeared on the checks to connect them with the obligation arising from the First Transaction so that a promise to pay the original debt can be implied.

■ Finally, we have considered the plaintiffs' remaining contentions that the defendants are estopped from pleading the statute of limitations because of Greenberg's alleged fraud and misrepresentations, and that Greenberg is liable because he made a binding oral promise in January 1979 to pay the debts. These contentions are without merit, and the trial court was correct in striking counts five and six.

Consequently, the judgment below in favor of the defendants will be affirmed, in part, reversed, in part, and the case will be remanded for a new trial on counts one, two and three. The new trial will be limited to the question whether the status reports, as a matter of fact under all the evidence, constitute sufficient acknowledgments, as required by the statute, to revive the period of limitations that we have determined expired in Transactions One, Two, and Three. If the plaintiffs prevail upon that issue, the merits of their claims can be adjudicated. If the plaintiffs do not prevail on that issue, judgment is to be entered for the defendants.

*Affirmed, in part,
reversed, in part,
and remanded.*