**WAMCO, III, LTD., Plaintiff,**

v.

**FIRST PIEDMONT MORTGAGE CORP., et al., Defendants.**

Civ. A. No. 2:93cv1003.

United States District Court,
E.D. Virginia,
Norfolk Division.

June 27, 1994.

Robert Temple Mayo, Williams, Mullen, Christian & Dobbins, Richmond, VA, for plaintiff.

Frank James Santoro, William Carl Northington, Marcus, Santoro & Kozak, Portsmouth, VA, for defendants.

## MEMORANDUM OPINION AND ORDER

PAYNE, District Judge.

WAMCO, III, Ltd. instituted this action against First Piedmont Mortgage Corp., Dale S. White and William M. Bethea as makers of a note in the face amount of $500,000 (the "Note") and against White and Bethea as guarantors of the Note. WAMCO alleges that the Note is in default and that the amount due, including interest and late charges, is $632,269.63. The defendants have moved for dismissal under Fed.R.Civ.P. 12(b)(6) on the ground that the claim is barred by Virginia's five year statute of limitations on written contracts. Va.Code Ann. § 8.01–246.

## STATEMENT OF FACTS

On October 7, 1987, First Piedmont, White and Bethea executed the Note which was payable to Investors Savings Bank ("Investors") in the principal amount of $500,000. On the same date, White and Bethea executed a Guaranty of Note (the "Guaranty"), jointly and severally guaranteeing payment of all amounts due under the Note. The Note and the Guaranty were attached to, and made part of, the Complaint.

The Note is a form entitled "Investor's Loan Note," one section of which is captioned "REPAYMENT" which, in turn, is divided into three subheadings which are captioned: "DEMAND," "TIME," and "MULTIPLE PAYMENT," respectively. The box adjacent to the section entitled "DEMAND" bears the typed notation, "XX." The "DEMAND" section of the Note reads as follows: [1]

II.  REPAYMENT  (Payments below are subject to change if the interest rate stated above is variable.)

☒ **DEMAND** ☒ The principal amount of this loan is payable on demand with interest from the date hereof payable:

☒ monthly   ☐ quarterly   ☐ at maturity
☐ other _____
beginning Nov. 7, 1987. Principal is due and payable on 10–7, 1988 if not demanded prior to.
☐ Principal is payable on demand, however the following repayment schedule will apply: _____

The boxes adjacent to the "TIME" or "MULTIPLE PAYMENT" subheadings are empty.

On December 13, 1991, the Resolution Trust Corporation ("RTC") was appointed

---

**1.** This is an exact replica of the pertinent section of the Note. The underscoring beneath "Nov. 7" and "87" and "10–7" and "88" in the text appears on the form as blank spaces which obviously were filled in when the Note was executed.

receiver for Investors and assumed control of Investor's assets, including the Note and the Guaranty. By then the Note was long since in default and no demand had been made by Investors. The Complaint alleges that: "[o]n or about June 30, 1992, the RTC sold certain of Investors' assets, including the Note and the Guaranty to WAMCO." There is attached to the Note an allonge by which RTC, "in its capacity as receiver for Investors," transferred the Note pursuant to the following endorsement: "Pay to the order of WAMCO, III, Ltd., a Texas limited partnership, without recourse and without representation or warranty, express or implied."

On October 7, 1993, WAMCO filed this action "as assignee of RTC" praying for judgment in the face amount of the Note with interest, late charges and attorney fees. The defendants moved to dismiss the complaint on the theory that the Note is a demand instrument on which the statute of limitations expired on October 7, 1992, five years after the Note was executed.

WAMCO takes the position that the Note is an instrument payable at a definite time and that the cause of action on it accrued on October 7, 1988, when payment had not been made by that date. Therefore, according to WAMCO, the action was timely filed under Virginia's five-year statute of limitations. Alternatively, WAMCO argues that, as assignee of RTC, it succeeded to the six-year statute of limitations provided in 12 U.S.C. § 1821(d)(14)(A) of the Federal Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") and that the action is timely even if the Note is a demand instrument.

## DISCUSSION

In determining a motion under Fed. R.Civ.P. 12(b)(6), the court is required to presume that all factual allegations in the Complaint are true and to accord all reasonable inferences to the non-moving party. 2A Moore's Federal Practice ¶ 12.07[2.5] (2d ed. 1994). The allegations of the Complaint are to be liberally construed and the motion should be granted only where "it appears

beyond doubt that the plaintiff can prove no set of facts in support of [the] claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

■ The bar of a statute of limitations may be interposed by a motion to dismiss "when the time alleged in the complaint shows that the action was not brought within the statutory period." 2A Moore's Federal Practice ¶ 12.10 (2d ed. 1994); *see Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462 (4th Cir.1991). All relevant dates appear in the Complaint or in the incorporated Note and Guaranty. Hence, the issue of timeliness may be decided as a matter of law if the characterization of the Note is also amenable to disposition as a matter of law.

## I. The Note: A Demand Instrument Or One Payable At A Definite Time?

Negotiable instruments are governed by the Uniform Commercial Code ("UCC"). Va.Code Ann. §§ 8.3–101 et seq. To be negotiable under the UCC, an instrument "must be payable on demand *or* at a definite time." Va.Code Ann. § 8.3–104(1)(c) (emphasis added);[2] Hawkland & Lawrence, UCC Series, §§ 3–104:12, 3–108:01 (Art. 3). "A negotiable instrument is payable on demand when it: (1) is expressly stated to be payable on demand; (2) is payable on sight; (3) is payable on presentation; or (4) states no time for payment." Anderson, Uniform Commercial Code, § 3–108:4 (3d ed. 1984); Va.Code Ann. § 8.3–108. Under the UCC, "[t]he distinguishing characteristic of an instrument payable on demand is that the time payment is due at the sole discretion of the holder." Hawkland & Lawrence, UCC Series, § 3–108:01 (Art. 3).

Instruments payable at a definite time are governed by Va.Code Ann. § 8.3–109 which provides that:

(1) An instrument is payable at a definite time if by its terms it is payable

  (a) on or before a stated date or at a fixed period after a stated date; or

---

**2.** The UCC does not limit negotiable instruments to those defined by Article 3, but this action does

not involve an instrument which is negotiable by virtue of some other provisions of law.

(b) at a fixed period after sight; or

(c) at a definite time subject to any acceleration; or

(d) at a definite time subject to extension at the option of the holder.

On its face, the Note is characterized as a demand instrument by virtue of the selection of the repayment option captioned "DEMAND." This characterization is underscored by the textual descriptions of the two repayment options that were not selected. The substantive text of the option captioned "TIME" provides for one payment in full due on a specific date. The substantive text of the option captioned "MULTIPLE PAYMENT" provides for installment payments to be made according to a specific schedule.

The text of the first sentence in the "DEMAND" section provides that "[t]he principal amount is payable on demand" with interest payable monthly beginning on November 7, 1987. This amplifies the characterization of the Note which is indicated by the notation "XX" that appears in the box opposite the section heading entitled "DEMAND."

WAMCO bases its argument that the instrument is payable at a definite time on the second sentence of the "DEMAND" section which states: "[p]rincipal is due and payable on 10–7 1988 if not demanded prior thereto." According to WAMCO, this sentence means that the Note is "simply, a fixed obligation of the maker with a defined maturity date combined with the right of the creditor to accelerate the note, if desired, before that maturity date." Plaintiff's Supplemental Brief, p. 7.

■■■ This argument, however, ignores: (i) the text of the first sentence in the "DEMAND" section, which expressly provides that principal is payable on demand; (ii) the significance of the selection from among three possible payment options the only one which provided for repayment on demand; and (iii) the headings and the text of the other two options each of which provided for repayment at a definite time but were not selected to describe the intent of the parties. Under familiar rules of construction, the sentence on which WAMCO relies must be read in context of the captions and the text of the

unselected alternatives. The net result of that review shows that the parties eschewed the repayment options which would have made the Note payable at a definite time and selected, instead, the "DEMAND" repayment option. Therefore, the form of the instrument shows that it is payable on demand, not at a definite time. *See Pavco Industries, Inc. v. First Nat'l Bank*, 534 So.2d 572, 576–77 (Ala.1988). When those factors are considered in perspective of the caption of the selected repayment option ("DEMAND") and the plain language of the first sentence of that option ("principal is payable on demand"), the Note, as a whole, reflects the intent of the parties to create an instrument repayable on demand, rather than at a definite time. Hence, under Virginia law, the statute of limitations began to run on October 7, 1987, the date of execution. Va.Code Ann. § 8.3–122; *Guth v. Hamlet Assoc.*, 230 Va. 64, 334 S.E.2d 558 (1985).

WAMCO seeks to avoid this result by arguing that the general rule activating the statute of limitations on a demand instrument does not apply "when the terms of the instrument disclose an intention by the parties that the note would not become due and payable immediately after the time of delivery." *Kersten v. Continental Bank*, 129 Ariz. 44, 48, 628 P.2d 592, 597 (App.1981). *See also Bank of Nevada v. United States*, 251 F.2d 820 (9th Cir.1957), cert. denied, 356 U.S. 938, 78 S.Ct. 780, 2 L.Ed.2d 813 (1958); and 10 C.J.S. § 247(b) (1975). This occurs, says WAMCO, where the making of a demand is an integral part of the cause of action, or a condition precedent to the right to sue on it. If such a condition exists, then the limitations period does not begin to run until a demand is made, *unless* "demand is waived or unreasonably delayed." *Bank of Nova Scotia v. St. Croix Drive–In Theatre, Inc.*, 552 F.Supp. 1244, 1249 (D.V.I.D. St. Croix 1982); *aff'd*, 728 F.2d 177 (3d Cir. 1984); *DiBattista v. Butera*, 104 R.I. 465, 467, 244 A.2d 857, 859 (1968); *Godde v. Wood*, 509 S.W.2d 435, 443 (Tex.Civ.App.— Corpus Christi 1974); and *Stanbury v. Larsen*, 803 P.2d 349, 353–54 (Wyo.1990).

WAMCO contends that the language of the Note establishes a condition precedent, in the

form of an actual demand by the creditor, in order for the cause of action to accrue before October 7, 1988. To support this position, WAMCO relies on *Bank of Nevada v. United States,* 251 F.2d 820 (9th Cir.1957), cert. denied, 356 U.S. 938, 78 S.Ct. 780, 2 L.Ed.2d 813 (1958); *Loomis v. Republic Nat'l Bank of Dallas,* 653 S.W.2d 75, 77 (Tex.App.–Dallas 1983); and *Foreman v. Graham,* 363 S.W.2d 371, 372 (Tex.Civ.App.–Beaumont 1962). Those authorities do not help WAMCO here.

In *Bank of Nevada,* the note contained the following language: "On Demand: if no demand is made then on August 14th, 1955...." *Bank of Nevada,* 251 F.2d at 827. The Ninth Circuit, applying the law of Nevada, held that "in the absence of demand, a note of the type that we are here considering falls due on the alternative date specified." *Id.* In so doing, the court determined in practical effect that the language created a hybrid instrument which contained properties of both a time instrument and a demand instrument. The court acknowledged that, before August 14, 1955, the note was a demand note because the bank, as holder, could demand payment unconditionally. However, the court also interpreted the instrument to impose the making of a demand as a condition precedent to maturation of the Note and, because demand had not been made, the court concluded that the note "fell due on the alternative date specified," essentially becoming a time instrument. *Bank of Nevada,* 251 F.2d at 827.

WAMCO's reliance on *Bank of Nevada* is misplaced because it was not decided under the UCC which, as adopted by Virginia, controls the issues presented in this action.[3] Nor, as will be explained later, is it in accord with Virginia's interpretation of the UCC.

WAMCO next cites *Foreman v. Graham,* in which a Texas Court of Appeals was asked to determine when the statute of limitations had begun to run on several oral agreements. The court observed that parties may agree to a contract which contemplates that money loaned will not become due until a demand is made[4] and that

> when money is payable on demand it is payable immediately, and no demand is necessary to start the running of the statute of limitation. However, if a demand is an integral part of the cause of action, or a condition precedent to the right to sue, the statute does not begin to run until a demand is made, unless demand is waived or is unreasonably delayed.

*Foreman,* 363 S.W.2d at 372 (citations omitted). *Foreman* is not persuasive because, like *Bank of Nevada, Foreman* was decided before Texas adopted the UCC and is not consistent with Virginia law.[5]

Moreover, *Foreman* also held that an actual demand was not necessary to start the limitations period, if "demand is waived or is unreasonably delayed." *Foreman,* 363 S.W.2d at 372. The Note here waives the maker's right to "require presentment, demand or notice of dishonor...." Accordingly, even under *Foreman* the statute of limitations would begin to run from the date of execution. *See,* Va.Code Ann. § 8.3–122.

WAMCO's argument is best postulated by the decision in *Loomis v. Republic Nat'l Bank of Dallas,* wherein a Texas intermediate appellate court was called upon to determine whether a note was a demand or a time instrument when it was payable "on demand or if no demand be made 1–31–77." Unable

3. *Bank of Nevada* was decided on December 31, 1957, and, although the Model Uniform Commercial Code was adopted by the ABA in the fall of 1951, the UCC was not adopted by Nevada until March 1, 1967. Ronald A. Anderson, Preface to the First Edition of *Uniform Commercial Code* at vii, xii (3d ed. 1981).

4. The Supreme Court of Virginia has also recognized that parties may negotiate a note which contemplates an actual demand, as a condition precedent to the maturity of the note and the running of the limitations period thereon. *Whi-*

*tehurst v. Duffy,* 181 Va. 637, 643, 26 S.E.2d 101, 103 (1943). (where some condition precedent to the right of action exists, whether it is a demand and refusal or some other act or contingency, the cause of action does not accrue, and action thereon cannot properly be commenced; nor does the statute of limitation begin to run until that condition is performed.)

5. *Foreman, supra,* was decided in 1962, while Texas did not adopt the U.C.C. until June 30, 1966. *See* Anderson, Preface to the First Edition of *Uniform Commercial Code* at xii.

to find Texas authority, the court in *Loomis* based its decision on *First Nat'l Bank v. Bell,* 140 Okl. 24, 282 P. 147 (1929), which had held that the language "on demand and, if no demand is made, then on Dec. 1, 1922" created an instrument which was not payable on demand because that language " '... amounted to an express covenant and agreement' that, unless a prior demand is made, the note should not mature until December 1, 1922." *Loomis,* 653 S.W.2d at 78 (citing *Bell,* 282 P. at 148–49). The *Loomis* court adopted this reasoning as its own and held that, because no demand had been made before January 31, 1977, the note had matured on that date with the consequence that the statute of limitations had begun to run then.

*Loomis* is also of doubtful probity because, although the UCC had been in effect in Texas for ten years by the time the note at issue had been executed, the court analyzed and decided the case without any reference to the UCC, relying instead upon the precode case from Oklahoma. More importantly, *Loomis* is squarely at odds with the controlling Virginia authority on the issue.

■■■ And, of course, it is the UCC, as interpreted and applied by the Supreme Court of Virginia, that governs the outcome of the issue here. In *Guth v. Hamlet Assoc.,* 230 Va. 64, 334 S.E.2d 558 (1985), the Court addressed a similar issue when called upon to review notes that contained no date upon which payment was due. They, instead, provided that:

> The borrower may at its option, either pay off the loan in full or repay the loan in twelve monthly installments....

*Id.* at 67, 334 S.E.2d at 561. Finding that the notes at issue stated no time for payment and hence were demand notes on which the statute of limitations had begun to run on execution, the Court then reviewed the plaintiffs' argument that "if the demand note and the parties thereto contemplated an actual demand, the cause of action accrues at the time of the demand, not on the date of the note." That is, for all practical purposes, the argument that WAMCO makes in this action based on *Bank of Nevada, Foreman* and

*Loomis.* The Supreme Court of Virginia rejected it in *Guth,* stating:

> The plaintiff's argument *blurs the distinction between "maturity" of an instrument and the "demand" for payment* of the obligation, *as those terms affect the accrual of the cause of action.* A demand note matures and is payable at once, and interest and the statute of limitations commence to run as of that date. [Citations omitted.] Of course every demand note contemplates that payment will be triggered by an actual demand in the form of a presentation or the equivalent. Nevertheless, *the need for an actual demand does not affect the maturity of the obligation or the running of the period of limitations.*

*Id.* at 72, 334 S.E.2d at 563–64. The reasoning in *Guth* applies with equal force to the argument advanced here by WAMCO.

Nor is WAMCO's position improved by its assertion that the Note "is a fixed obligation of the maker with a defined maturity date combined with the right of the creditor to accelerate the note, if desired, before the maturity date." Plaintiff's Supplemental Brief, p. 7. WAMCO cited no authority for this argument, but apparently bases it on Va.Code Ann. § 8.3–109(1)(c) which provides that an instrument is payable at a definite time if it is "payable at a definite time subject to any acceleration."

■■■ The argument is based on a misapprehension of the role of, and the rules controlling the exercise of, acceleration clauses under the UCC. An acceleration clause is a vehicle which permits a lender to protect against changes in credit risk which occur before maturity. Hawkland & Lawrence, UCC Series § 3–109:04 (Art. 3); 11 Am.Jur. 2d, *Bills and Notes* § 179 (1963). Although acceleration clauses often serve the legitimate interests of holders, they also present the holder with potentially unfair power and are susceptible of misuse. The UCC addressed these competing considerations by permitting the activation of acceleration clauses only when the holder "believes in good faith that the prospect of payment or performance is impaired." Hawkland & Lawrence, UCC Series § 3–109:04 (Art. 3).

The imposition of such a restriction on the holder's right to control the time of payment is fundamentally at odds with the concept of demand under the UCC, which vests absolute discretion in the holder respecting the time of payment.[6] Hawkland & Lawrence, UCC Series § 3–108:01 (Art. 3). Accordingly, it defies both logic and the provisions of Article 1–208 to equate the term "subject to acceleration" in Article 3–109(1)(C) with the term "demand" as used in Article 3:108.

For the foregoing reasons, the Note is payable on demand, rather than at a definite time. Having determined that the Note is a demand instrument, it is now necessary to determine whether WAMCO's claim is barred by the statute of limitations applicable in actions to recover under such instruments.

## II. Is the Claim On The Note Time Barred?

■■■ A cause of action on a demand instrument accrues on its date or, if no date is stated, on the date of its issue. Va.Code Ann. § 8.3–122; *Guth v. Hamlet Associates,* 230 Va. 64, 334 S.E.2d 558 (1985). The Note is a written contract and, pursuant to Va. Code Ann. § 8.01–246 subd. 2, an action on it must be brought within five years of the date that the cause of action accrues. The Note bears the date of, and was issued on, October 7, 1987. Consequently, under Virginia's five-year statute of limitations, the claim on the Note was time barred on October 7, 1992. The claim on the Guaranty also is barred because, under Virginia law, the cause of action on a guaranty of demand note accrues at the same time as does the claim on the note. *Guth v. Hamlet Associates,* 230 Va. at 74; 334 S.E.2d at 565.

WAMCO's claim is timely, therefore, only if the six-year statute of limitations in FIR-REA applies. 12 U.S.C. § 1821(d)(14)(A)(i). The Complaint asserts that WAMCO is the assignee of RTC which was appointed receiver for Investors on December 13, 1991. This, says WAMCO, entitles it to the same limitations period to which RTC, as receiver,

would be entitled if it had brought an action to enforce the Note. If WAMCO is correct, the action was timely filed.

■■■ When acting as receiver of an insured depository institution, RTC is deemed to be an agent of the United States by virtue of the provisions of 12 U.S.C. § 1441a(b)(1)(A). Under the provisions of 12 U.S.C. § 1441a(b)(4)(A), RTC, as receiver, has the same rights and powers as does the Federal Deposit Insurance Corporation under 12 U.S.C. §§ 1821–1823. The relevant part of those statutes for purposes of this action is 12 U.S.C. § 1821(d)(14)(A) and (B) which provide as follows:

**Statute of limitations for actions brought by conservator or receiver**

**(A) In general**

Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Corporation as conservator or receiver shall be—

(i) in the case of any contract claim, the longer of—

(I) the 6–year period beginning on the date the claim accrues; or

(II) the period applicable under State law;

\*    \*    \*    \*    \*    \*

**(B) Determination of the date on which a claim accrues**

For purposes of subparagraph (A), the date on which the statute of limitation begins to run on any claim described in such subparagraph shall be the later of—

(i) the date of the appointment of the Corporation as conservator or receiver; or

(ii) the date on which the cause of action accrues.

WAMCO's theory is that, under well-settled principles of common law, an assignee stands in the shoes of the assignor and that consequently it, as the assignee of RTC, is

---

**6.** The right of demand, of course, is a form of acceleration, but it is not the specie of accelera-

tion referred to in Va.Code Ann. § 8.3–109(1)(c).

entitled to the benefit conferred upon RTC under 12 U.S.C. § 1821(d)(14). Neither the six-year statute of limitations in § 1821(d)(14) nor any other section of FIR-REA mentions the rights of RTC's assignees. Nonetheless, WAMCO's position finds support in virtually every decision to date which has considered the issue.

The first reported decision to address the question is *Mountain States Financial Resources Corp. v. Agrawal*, 777 F.Supp. 1550 (W.D.Okla.1991) wherein the court held that an action on two promissory notes was subject to the six-year statute of limitations in FIRREA, rather than Oklahoma's five-year contract statute of limitations. The reason given for that decision was:

> An assignee stands in the shoes of the assignor, and acquires all of the assignor's rights and liabilities in the assignment. This general principle and a strong public policy require that the FDIC's assignee acquire the six-year limitations period provided by § 1821(d)(14)(A). [citations omitted].

The decision in *Mountain States* does not explicate the reasoning for applying the common law of assignments as the predicate of the analysis it makes. The holding also purports to find substantial support in the decision of the Supreme Court of the United States in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942)[7] wherein the Court held that agreements collateral to negotiable instruments in the hands of federal depository institutions would not be binding upon the FDIC in its capacity as receiver.

The decision in *Mountain States* was adopted in *Fall v. Keasler*, 1991 WL 340182 (N.D.Cal.1991). In *Keasler*, the court also took the view that the policy favoring sale of assets by the FDIC required the application of FIRREA's six-year statute of limitations. Like the decision in *Mountain States*, the court in *Keasler* also invoked the *D'Oench, Duhme* doctrine and its subsequent statutory codification, 12 U.S.C. § 1823(e), to support the observation that "there would be little or

no incentive for prospective purchasers [of the assets of failed federally insured depository institutions] to acquire them if they were *subject to the personal defenses of the obligors based on undisclosed agreements.*" *Keasler*, 1991 WL 340182, * 4 (emphasis added). That, of course, may be true, but the statute of limitations is not "an undisclosed agreement." Nonetheless, the court in *Keasler* went on to observe that:

> The same policy compels giving the FDIC's assignees the benefit of the FIR-REA statute of limitations. To hold that assignees are relegated to the state statute of limitations would serve only to shrink the private market for the assets of failed banks. It would require the FDIC to hold onto and prosecute all notes for which the state statute of limitations has expired because such obligations would be worthless to anyone else. This runs contrary to the policy of allowing the FDIC to rid the federal system of failed bank assets. *The FDIC can only make full use of the market in discharging its statutory responsibilities if the market purchasers have the same rights to pursue actions against recalcitrant debtors as does the FDIC.*

*Id.* at * 4. (emphasis added).

Several other courts also have relied on the rationale expressed in *Mountain States* and *Keasler* to extend to assignees of RTC the benefit of the six-year limitations created for RTC, as receiver, in 12 U.S.C. § 1821(d)(14). *FDIC v. Bledsoe*, 989 F.2d 805 (5th Cir.1993); *White v. Moriarty*, 15 Cal.App. 4th 1290, 19 Cal.Rptr.2d 200 (First Division 1993); *Tivoli Ventures, Inc. v. Tallman*, 870 P.2d 1244 (Colo.1994); *Martin v. The Cadle Company*, 1993 WL 381101 (Idaho Dist.1993); *The Cadle Company II, Inc. v. Lewis*, 254 Kan. 158, 864 P.2d 718 (1993); *Central States Resources v. First Nat'l Bank*, 243 Neb. 538, 501 N.W.2d 271 (1993); *Thweatt v. Jackson*, 838 S.W.2d 725 (Tex. App.–Austin 1992), *aff'd*, 883 S.W.2d 171 (Tex.1994); and *Jon Luce Builder, Inc. v. First Gibraltar Bank, F.S.B.*, 849 S.W.2d 451 (Tex.App.–Austin 1993). *See also* Brian J.

---

7. The citation to *D'Oench, Duhme* apparently has reference to the public policy considerations articulated in that case. However, nothing in *D'Oench, Duhme* directly supports the rationale on which *Mountain States* was decided.

Woram, *FIRREA's Statutes of Limitations: Their Availability to Purchasers From the FDIC,* 110 Banking L.J. 292 (1993) (concluding that FIRREA limitations should be extended to subsequent purchasers); James J. Boteler, Comment, *Protecting the American Taxpayers: Assigning the FDIC's Six Year Statute of Limitations to Third Party Purchasers,* 24 Tex.Tech.L.Rev. 1169, 1200 (1993).

The most complete reasoning offered in support of this approach is found in *FDIC v. Bledsoe,* 989 F.2d 805 (5th Cir.1993). In *Bledsoe,* the United States Court of Appeals for the Fifth Circuit correctly observed that FIRREA was silent respecting the rights of RTC's assignees and concluded that, in the face of this silence, the common law of assignments supplied the controlling rationale for determining the rights of RTC's assignees. The court then concluded that, because an assignee at common law stood in the shoes of his assignor, assignees of RTC were entitled to the benefit of the six-year statute of limitations in 12 U.S.C. § 1821(d)(14).

The authority on which *Bledsoe* was decided, however, does not support the result it reached. First, the Fifth Circuit relied on a decision of the United States Court of Appeals for the D.C. Circuit [8] which simply acknowledged the principle that the statute of limitations continues to run against an assignee just as it runs against the assignor. The Fifth Circuit also found support in general statements appearing in the Restatement (Second) of Contracts § 336 and in *American Jurisprudence* respecting the ability of an obligee to interpose the defense of the statute of limitations against the assignee because that defense would be available against an assignor.[9] Finally, the court referred to UCC § 3–201(1) which provides that the "transfer of an instrument vests in the transferee such rights as the transferor has therein." This authority, the Fifth Circuit concluded, warranted application of the common law of assignments which, in turn,

required that assignees of RTC be accorded the benefit of FIRREA's six-year statute of limitations. The Fifth Circuit also was persuaded that policy reasons having their genesis in the *D'Oench, Duhme* doctrine supported the conclusion that assignees should have the benefit of the six-year period available to RTC.

Decisions of intermediate appellate courts in Texas and Colorado rejected arguments such as that on the theory that the plain language of the statute made it applicable only in actions brought by RTC in its capacity as receiver. *Federal Debt Management, Inc. v. Weatherly,* 842 S.W.2d 774 (Tex.App.– Dallas 1992) [10]; *Tivoli Ventures, Inc. v. Tallman,* 852 P.2d 1310 (Colo.Ct.App.Div. III 1992). Neither decision, however, survived ensuing appellate review where each was reversed for essentially the reasons set forth in *Mountain States, Keasler,* and *Bledsoe. Tivoli Ventures, Inc. v. Bumann,* 870 P.2d 1244 (Colo.1994); *Jackson v. Thweatt,* 883 S.W.2d 171 (Tex.1994). Hence, the position here advanced by WAMCO has been accepted by the three federal courts and the seven state courts which have considered the issue. The common grounds upon which these courts have reached those results are: (1) the common law of assignments, as evidenced principally in Restatement (Second) of Contracts § 336 which establishes the principle that the assignee stands in the shoes of the assignor; and (2) policy considerations underlying the necessity of assuring the broadest possible market for the assets of failed banks and federally insured depository institutions.

This considerable volume of decisional law makes WAMCO's position a most respectable one. However, examination of those decisions discloses that each was decided upon the same erroneous premise. Application of the appropriate principles leads to the conclusion that the six-year statutory period provided in 12 U.S.C. § 1821(d)(14) does not inure to the benefit of WAMCO.

---

**8.** *Fox–Greenwald Sheet Metal Co. v. Markowitz Bros., Inc.,* 452 F.2d 1346, 1357 n. 69 (D.C.Cir. 1971).

**9.** 6 Am.Jur.2d *Assignments* § 102 (1963).

**10.** The opposite result was reached by another Texas intermediate appellate court in *Thweatt v. Jackson,* 838 S.W.2d 725 (Tex.App.—Austin 1992), *aff'd,* 883 S.W.2d 171 (Tex.1994).

The first step in assessing the meaning and effect of a statute is to examine its plain language. *Freytag v. Commissioner,* 501 U.S. 868, 873, 111 S.Ct. 2631, 2636, 115 L.Ed.2d 764 (1991). The statute here provides that "[n]otwithstanding any provision of any contract, the applicable statute of limitations with regard to *any action brought by the corporation* as conservator or *receiver* shall be..." (emphasis added). 12 U.S.C. § 1821(d)(14)(A). Accordingly, by its plain terms, the statute applies in actions brought by the RTC in its capacity as either conservator or receiver.

Indeed, it could not be seriously argued that the six-year period would apply in an action brought by RTC in its corporate capacity, rather than its capacity as a receiver. Thus, in a very real sense, the statute confers a benefit that is personal to RTC when it institutes an action as a receiver. In other words, the remedial benefit conferred by the statute is explicitly tied to the status of the entity on which it is conferred.

None of the decisions conferring the benefits of this statute upon the assignees of RTC suggest otherwise. For the most part, those decisions ignore the actual language of the statute and decide the issue on the basis of the common law of assignments and policy considerations. The Fifth Circuit in *Bledsoe* took a more direct approach by interpreting the statute as silent on the rights of assignees and then using this as a basis to import the common law of assignments "to fill the gap." *FDIC v. Bledsoe,* 989 F.2d at 810.

There is, of course, nothing inherently erroneous in that approach because the common law is an oft-used aid to statutory interpretation. However, resort to that approach first necessitates a judgment that the statute does not address the issue. That fundamental prerequisite is not present here because, although FIRREA does not bespeak the rights of assignees, it is not silent on the scope of the remedial benefit it confers. Indeed, by plainly making that benefit a personal one which inures only to the RTC, as receiver, the statute supplies important guidance, and a significant limitation, on how the law of assignments can apply, if at all, with respect to the remedial benefit conferred on RTC as receiver.

■■■■■ This is because there is another fundamental component of the common law of assignments which circumscribes the common law maxim that the assignee stands in the shoes of the assignor. More fully stated with its appended limitations, the rule on which *Mountain States, Bledsoe* and their progeny rely is that:

> unless a contrary intention is manifest or inferable, an assignment ordinarily carries with it all rights, remedies and benefits which are incidental to the thing assigned, *except those which are personal to the assignor and for his benefit only.*

6A C.J.S. Assignments § 76 (emphasis added). *Rasp v. Hidden Valley Lake, Inc.,* 519 N.E.2d 153, 158 (Ind.Ct.App.1988); *Fischer v. Klink,* 234 Iowa 884, 891, 14 N.W.2d 695–699 (1944). This principle arose to preclude assignment of purely personal causes of action, such as for fraud, and rights not running with real estate which were not subject to assignment. *Breidecker v. General Chemical Co.,* 47 F.2d 52 (7th Cir.1931); *Huston v. Ohio and Colorado Smelting and Refining Co.,* 63 Colo. 152, 165 P. 251 (1917). However, there is no reason that this fundamental circumscribing principle should not apply where a statute defines as personal the incident of the assignment which is at issue. To the contrary, it is logical that the principle would apply with even greater force where the limitation is imposed by statute and where, as here, the statute makes clear that the incidental right, remedy or benefit is in fact personal in nature and for the benefit of the assignor when acting in a certain capacity.

Congress, in plain and simple language made the six-year statute of limitations in FIRREA applicable only to actions brought by RTC in its status as receiver. It is difficult to envision a remedy or benefit that is more personal in nature. For these reasons, it appears that the common law maxim which lies at the heart of WAMCO's authority does not operate to confer the benefit of the six-year statute of limitations on the assignees of the RTC.

Nor do the other authorities cited by *Bledsoe* support application of the common law of assignments. For example, the court in *Bledsoe,* like several other courts, relied on illustration 3 to Comment b of § 336 of the Restatement to justify application of the common law of assignments to negotiable instruments transferred by RTC. The illustration provides:

A lends money to B and assigns his right to C. C's right is barred by the Statute of Limitations when A's right would have been.

Restatement (Second) of Contracts, § 336, Comment b, illustration 3.

Section 336 is found in Chapter 15 of the Restatement which is entitled "ASSIGNMENT AND DELEGATION." In defining the scope of Chapter 15, § 316(2) cautions that the rules in Chapter 15 are modified by the principles of the law of commercial paper and negotiable instruments. Further, according to the official comments, § 336 does not apply to the negotiation or transfer of negotiable instruments. Restatement of Contracts (Second) § 336, Comment a. For these reasons, § 336 does not lend support to reliance on the common law maxim ["the assignee stands in the shoes of the assignor"] as the basis for making FIRREA's six-year statute of limitations available to those to whom RTC transfers negotiable instruments. However, the fact that the law of assignments does not apply with full force to negotiable instruments neither ends the inquiry nor settles the issue.

■ The Note was transferred pursuant to an allonge executed on June 20, 1992 and therefore the provisions of the UCC in effect at the time of transfer will control the effect and scope of the transfer.[11] Under Va. Code Ann. § 8.3-201(1), the "[t]ransfer of an instrument vests in the transferee such rights as the transferor has therein...." This means that "[t]he transfer of an instrument, whether by negotiation or otherwise, vests in the transferee all of the transferor's rights *in the instrument*." Hawkland .& Lawrence UCC Series § 3-201:02 (Art. 3) (emphasis added). Moreover, "[a]lthough a transferee obtains all of his transferor's rights, he does not obtain his status...." *Id.* This fundamental UCC principle, of course, has reference to the transferor's status as a holder or a holder in due course, but it serves further to illustrate the concept that the effect of a transfer of a negotiable instrument, such as the Note, is to transfer the rights in the instrument and not the rights attendant the status of the transferor. This concept is also reflected in the rule that the transferee must acquire "holder" or "holder in due course" status as a consequence of his own actions, inactions or knowledge. *Id.*

■ It appears as if the Note was transferred by both delivery and endorsement in June 1992. Therefore, it is of no moment for the instant analysis whether there was a "transfer" within the meaning of Va.Code Ann. § 8.3-201(1) or a "negotiation" within the meaning of Va.Code Ann. § 8.3-202(1). In either event, the transfer of the Note operated simply to transfer the rights which RTC had in the Note and nothing in the UCC operates to make a statute of limitations an incident of the Note which is transferable.

Accordingly, whether the transfer is measured against the principles of the UCC or the common law of assignments, it appears that neither body of law operates to transfer to WAMCO a right conferred upon RTC solely in its status as receiver and clearly personal to it when, and only when, acting in that status, it files an action. RTC, as receiver, did not institute this action and hence the six-year statute of limitations in FIRREA does not apply here.

It is no doubt true that there are valid policy reasons which can be advanced for interpreting the statute in another fashion.[12]

---

**11.** This means that the changes effectuated on January 1, 1993 do not apply here and hence will not be considered.

**12.** *Mountain States, Keasler, Bledsoe* and their progeny have grounded their resort to policy factors in the *D'Oench Duhme* doctrine and its statutory codification, 12 U.S.C. § 1823(e). That doctrine, however, arose and has been perpetuated to avoid subjecting prospective purchasers of federally insured paper to the personal defenses of obligors based on undisclosed agreements. Statutes of limitation do not admit of such a classification and it is therefore difficult to un-

However, that is a matter for the legislature, not for the courts, and where, as here, Congress has spoken plainly to confer a benefit on a particular entity functioning in a particular status, it is not for the courts to assess the various policy considerations which would support having enacted the statute to provide otherwise.

For the foregoing reasons, the court concludes that the five-year Virginia statute of limitations applies here and that the action instituted WAMCO was time barred on October 7, 1992.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to all counsel of record.

It is so ORDERED.

derstand why it is appropriate to treat them as if they were undisclosed agreements. Yet, that is the result of resorting to the D'Oench, Duhme doctrine as a rationale for deciding whether FIRREA's six-year statute inures to the benefit of RTC's assignees.